IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

FILED
U.S. DISTRICT COURT

2007 MAR 14  P 3: 26

DISTRICT OF UTAH

BY: _____
       DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br><br><br>        vs.<br><br><br>Miguel Carrera, et al.,<br><br>        Defendants. | **REPORT AND RECOMMENDATION**<br><br><br><br>Case No. 2:05-CR-895 DAK |

Before the court is a motion to suppress all evidence of the interception of telephonic communications of telephone numbers (801) 759-7129 and (801) 474-9763, seized pursuant to wiretap orders issued by United States District Judge Dee Benson. Defendants Javier Segura (Docket Entry #324), Genaro Medina Luna (Docket Entries #330, 397), Mont Housekeeper (Docket Entry #400), Eric Angell (Docket Entry #341), and Jeffrey Thiemig (Docket Entry #339) all seek to suppress the wiretap evidence.[1]

After thoroughly reviewing and considering the parties' pleadings, the court recommends that Defendants' motions to suppress (#324, 330) be denied.

---

[1] Defendants Juan Espitia-Jimenez and Jason Nunley had also joined in the motion to suppress wiretap evidence (Docket Entries #336, 404).  Juan Espitia-Jimenez pleaded guilty on February 20, 2007 (Docket Entry #425), and Jason Nunley pleaded guilty on March 13, 2007 (Docket Entry #448).

**BACKGROUND**

On November 6, 2006, Defendant Segura filed a motion to suppress all evidence of the interception of telephonic communications of telephone numbers (801) 759-7129 and (801) 474-9763, seized pursuant to wiretap orders issued by United States District Judge Dee Benson.  (Docket Entry #324.)  On November 7, 2006, Defendant Luna filed an almost identical motion, seeking to have the same evidence excluded that Segura sought to have excluded.  (Docket Entry #330.)  On November 9, 2007, Defendants Housekeeper, Nunley, and Thiemig joined in Segura's motion to suppress.  (Docket Entries #334, 336, 339.)  On November 11, 2007, Defendant Angell also joined in Segura's motion to suppress.  (Docket #341.)

On January 18, 2007, Segura filed a memorandum in support of his motion to suppress the wiretap evidence.  (Docket Entry #394.)  Segura also separately filed exhibits and attachments to his memorandum.  (Docket Entry #395.)  That same day, Luna joined in Segura's memorandum.  (Docket Entry #397.)  On January 25, 2007, Housekeeper also filed a notice that he joined in Segura's memorandum.  (Docket Entry #400.)

On February 6, 2007, the government filed its memorandum in response to Defendants' motions to suppress the wiretap evidence.  (Docket Entry #412.)  On March 1, 2007, the court held a hearing, during which the court took under advisement Defendants' motions to suppress the wiretap evidence.

## ANALYSIS

Defendants seeks to suppress evidence obtained from communications intercepted by the government from the wiretap orders of August 22, 2005, and October 24, 2005, authorized by Judge Benson.  Defendants make two main arguments.  First, Defendants argue that the government's applications were inadequate on their face to satisfy the "necessity requirement" of Title III.  *See* 18 U.S.C. § 2518(1)(c).  Second, Defendants argue that the court's two wiretap orders and the government agents' efforts violated the minimization requirements of the wiretap statute.  *See* 18 U.S.C. § 2518(5).  "[A] district court's wiretap authorization order is presumed proper, and the defendant bears the burden of overcoming this presumption."  *United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th Cir.), *cert. denied*, 522 U.S. 961 (1997).[2]

### A.  Necessity

The court first addresses Defendants' argument that the government's applications were inadequate on their face to satisfy the "necessity requirement" of Title III.  *See* 18 U.S.C. § 2518(1)(c).  The statute governing wiretaps contains a

---

[2]The court recognizes that only "aggrieved persons" have standing to seek suppression of evidence obtained from a wiretap. *See Alderman v. United States*, 394 U.S. 165, 176 (1969). However, the government has not addressed standing as an issue in this case.  Therefore, the court concludes that the government concedes that all of the defendants who have joined in the motions to suppress the wiretap evidence have standing.

"necessity" requirement which is separate and distinct from a "probable cause" requirement.[3]  To comply with the necessity requirement, an application for a wiretap authorization must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  The judge issuing an authorization order must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(3)(c); *see also United States v. Castillo-Garcia*, 117 F.3d 1179, 1185 (10th Cir. 1997), *overruled on other grounds by United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 n.1 (10th Cir. 2002).  The necessity requirement serves the purpose of ensuring "'that the relatively intrusive device of wiretapping "is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."'"  *Castillo-Garcia*, 117 F.3d at 1185 (citations omitted).

Simply because a normal investigative technique is theoretically possible does not mean that it is likely to succeed.  *See Castillo-Garcia*, 117 F.3d at 1186.  Rather, "'[w]hat the provision envisions is that the [government's] showing [of necessity] be tested in a practical and commonsense

---

[3]Defendants have not argued that the intercept orders lacked probable cause.

fashion.'"  *Id.* (citations omitted).  Therefore, "a court must undertake 'a consideration of all the facts and circumstances' in order to determine whether the government's showing of necessity is sufficient to justify a wiretap."  *Id.* (citation omitted).

In addition, the necessity requirement is not an exhaustion requirement.  *See id.*  "[L]aw enforcement officials are not required to exhaust all other conceivable investigative procedures before resorting to wiretapping."  *United States v. Edwards*, 69 F.3d 419, 429 (10th Cir. 1995), *cert. denied*, 517 U.S. 1243 (1996) (internal quotation marks and citations omitted).  "Thus, the government may obtain a wiretapping warrant without trying *any* other methods of investigation, if it demonstrates that normal investigatory techniques reasonably appear to be unlikely to succeed if tried, or to be too dangerous to try."  *Castillo-Garcia*, 117 F.3d at 1187; *see also* 18 U.S.C. §§ 2518(1)(c), 2518(3)(c).

"To obtain an electronic surveillance order, the government must explain fully in its application what investigative techniques have been tried against the target of the wiretap." *Killingsworth*, 117 F.3d at 1163; *accord Castillo-Garcia*, 117 F.3d at 1187.  "If any of the four categories of normal investigative techniques referred to in the legislative history of Title III have not been tried, the government must explain with particularity why each of such untried techniques would be either unsuccessful or too dangerous."  *Killingsworth*, 117 F.3d at 1163;

*accord Castillo-Garcia*, 117 F.3d at 1187.   Those four techniques
are:  "(1) standard visual and aural surveillance; (2)
questioning and interrogation of witnesses or participants
(including the use of grand juries and the grant of immunity if
necessary); (3) use of search warrants; and (4) infiltration of
conspiratorial groups by undercover agents or informants."
*Killingsworth*, 117 F.3d at 1163.  In addition, the government
must explain why pen registers or trap and trace devices have not
been tried.  *See id.; Castillo-Garcia*, 117 F.3d at 1187-88.
Furthermore, depending on the unique circumstances of each case,
the government also may be required to show why other normal
investigative techniques have not been tried.  *See Killingsworth*,
117 F.3d at 1163; *Castillo-Garcia*, 117 F.3d at 1188.

    "[W]here the government's stated explanation for its use, or
failure to use, normal investigative techniques clearly
encompasses each of these categories and any other normal
investigative techniques that may be applicable to the
circumstances, it is not necessary for the government formally to
address each category with an explanation."  *Castillo-Garcia*, 117
F.3d at 1188.  "Thus, the government's failure explicitly to
explain its failure to utilize one or more specified categories
of normal investigative techniques will not be fatal to its
wiretap application if it is clear, under the government's
recitation of the facts of the case, that requiring the
government to attempt the unexhausted and unexplained normal

investigative techniques would be unreasonable." *Id.* However, "generalities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application." *Id.* "'Instead, [the court] require[s] the government to prove exhaustion--either by attempt or explanation of why the method would not work--of all "reasonable" investigatory methods.'" *Id.* (citations omitted).

Turning to the case before the court, Defendants argue that the two wiretap orders were not necessary and that the evidence obtained as a result of the wiretaps authorized by them should be suppressed. Defendants make two main arguments to support their necessity argument. First, Defendants argue that the primary goals of the investigation had been accomplished or were close to completion at the time the applications for wiretap were made. Second, Defendants argue that the government failed to establish the futility of alternative investigative techniques in its applications. The court addresses each of these arguments in turn.

1. **Had the Primary Goals of the Investigation Been Accomplished or Were Close to Completion at the Time the Applications for Wiretap Were Made?**

First, Defendants argue that the wiretaps were not necessary because the primary goals of the investigation either had been accomplished or were close to being accomplished by other traditional investigative techniques at the time the applications for wiretap were made on October 25, 2005, and August 22, 2005.

7

Defendants set forth a lengthy argument asserting that the scope
of the alleged criminal activity, the identity of the principals
of the alleged drug conspiracy, the identity of persons
associated with the alleged drug conspiracy, and the identity of
the periphery of the alleged conspiracy had all been found out or
were close to being found out by using traditional methods of
investigation before the August and October 2005 wiretap orders
were signed.  Defendants argue that "all the government had to
warrant authorization of the wiretaps in August and October 2005
was a meaningless boilerplate paragraph," and the "application
lacked any substance in detailing what elements of the
investigation were left to undertake.  In fact, all the
government actually accomplished with the intercept granted in
October was more controlled buys and the accumulation of the same
type of evidence it had in its possession for months."  (Docket
Entry #394, at 15.)

    The government counters by explaining that Defendants are
mistaken in asserting that because ten defendants are charged in
the Count 1 conspiracy beginning in March 2005, that all of those
defendants were identified as members of the conspiracy in March.
Instead, the government explains, that by the submission of the
August affidavit, agents had only been able to identify
Defendants Carrera, Pacheco, Beauchaine, and Wright as co-
conspirators.  The government admits that law enforcement had
identified Carrera and a couple other co-conspirators as early as

March 2005, but, the government explains, "despite extensive investigative efforts, the investigation was not able to identify all of the drug suppliers and the scope of the conspiracy without the aid of the wiretap."  (Docket Entry #412, at 7.)  In fact, the government points out that neither Segura nor Valencia were identified as significant methamphetamine suppliers for the Carrera drug trafficking organization before the wiretap was initiated.  In addition, as the wiretap proceeded, more co-conspirators were identified, as were the extent and methods of the narcotics activities and the location of narcotics and drug proceeds.  As set forth in both affidavits, those investigative accomplishments were exactly the objectives of the wiretap. (Docket Entry #395, Exhibit A (hereafter referred to as "Exhibit A"), page 9, ¶21; Docket Entry #395, Exhibit B (hereafter referred to as "Exhibit B"), page 5, ¶10.)  Defendants have not contested the information provided by the government in its memorandum, and the court concludes that the government has adequately demonstrated that the primary goals of the investigation had not been accomplished and were not close to being accomplished by other traditional investigative techniques at the time the applications for wiretap were made on August 22 and October 25, 2005.

**2.   Did the Government Fail to Establish the Futility of Alternative Investigative Techniques in Its Applications?**

Second, Defendants argue that the government failed to establish the futility of alternative investigative techniques in its applications for the wiretap orders.  As set forth above, the government is required to explain with particularity in its application for a wiretap order why each of the following normal investigative techniques have either tried and failed, or if not tried, why the technique would be either unsuccessful or too dangerous: (1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; (4) infiltration of conspiratorial groups by undercover agents or informants; and (5) pen registers and trap and trace devices.  *See Killingsworth*, 117 F.3d at 1163; *Castillo-Garcia*, 117 F.3d at 1187-88.  The court examines each affidavit to determine if the government established the futility of these six alternative investigative techniques.

First, before examining the specific investigative techniques discussed in the affidavits, the court addresses Defendants' argument that the affidavits' discussions of many of the investigative techniques are merely boilerplate, could apply to any drug investigation, and should thus fail.  Having carefully examined the affidavits, the court rejects this

10

argument.  Simply because the same factors that make a particular
technique unlikely to succeed in one case exist in other similar
cases does not automatically negate that the affidavit has shown
necessity.  Rather, similar factors can exist in many cases of a
similar nature.  Here, the affiant demonstrated in each affidavit
that a reasoned basis existed for the necessity of the wiretap.
*Cf. Killingsworth*, 117 F.3d at 1164-65.  Thus, the court rejects
Defendants' boilerplate language argument.

The court now turns to a detailed analysis of each of the
normal investigative techniques discussed in the August
affidavit.

### a.  August 22, 2005 Affidavit

#### i.  Surveillance

The August 22, 2005 affidavit explains that before seeking
the wiretap order, agents had conducted extensive surveillance on
Carrera, including surveillance before, during, and after
undercover drug purchases.  (Exhibit B, at 40-41.)  The August
affidavit discusses the problems with surveillance.  For example,
the affidavit stated that "much of the illegal activity
associated with this organization takes place inside locations
which are out of view of law enforcement surveillance efforts,
including apartments and automobiles."  (Exhibit B, at 41.)  In
addition, Carrera spotted surveillance officers on several
occasions, surveillance was lost on Carrera at critical times in
the investigation, Carrera moved locations of transactions at the

last minute or was unwilling to conduct transactions when he thought he was being followed, and Carrera changed vehicles frequently, including in the middle of drug transactions, in an effort to thwart law enforcement.  Therefore, the affidavit explains that although surveillance was somewhat effective in following Carrera, it was of limited use without the accompanying wiretap.

Thus, having carefully examined Defendants' argument, the court concludes that the affidavit succeeded in explaining how surveillance had been attempted and why it was unlikely to succeed in accomplishing all the objectives of the investigations without the aid of a wiretap.

### ii.   Questioning and Interrogation of Witnesses or Participants

The August affidavit also carefully explained why questioning and interrogation of witnesses or participants would be unsuccessful or too dangerous if attempted (Exhibit B, at 43-44), and Defendants have not specifically challenged the sufficiency of this aspect of the affidavit.  The affidavit specifically explains the reasons that that particular investigative technique would be unsuccessful in the investigation.  First, witnesses who could provide additional evidence to the grand jury regarding the activities, source of supply, buyers, and identities of other conspirators were members of the conspiracy themselves.  Second, many of those people had

12

not been identified because they were illegal aliens who used false names and for whom there was little or no way to ascertain their identities.  Third, without understanding the relative roles of each individual conspirator, it would thwart public policy to immunize a higher level person to testify against lower level persons.  Fourth, arresting and interviewing a co-conspirator would likely lead to that person tipping off other members of the conspiracy as to law enforcement's investigation. Fifth, many co-conspirators appeared to be relatives or close associates of each other.  Thus, it appeared unlikely that they would testify against each other.

The court concludes that the affidavit adequately explained why questioning and interrogation of witnesses or participants would be unsuccessful or too dangerous.

### iii.  Use of Search Warrants

The August affidavit also discussed the use of search warrants as an investigative technique.  (Exhibit B, at 44-45.) The affidavit explained that investigators were only aware of a single location where it was suspected that the drug trafficking organization conducted illegal activities.  The affidavit explained the investigators did not know where all the targets of the investigation received, hid, and distributed the narcotics collected, and based on narcotics training and experience, it was common for narcotics distributors to use several locations to package and store their drugs.

13

The affidavit stated that a wiretap may be the only way to identify all the narcotics distribution locations.  Furthermore, the affidavit discussed that in order to prevent evidence from being destroyed or moved, the simultaneous execution of search warrants was necessary.

The court concludes that the affidavit adequately explained why search warrants would not be effective at that stage of the investigation and why wiretaps were needed to effectively execute simultaneous search warrants.  The court therefore rejects Defendants' arguments regarding the use of search warrants.

### iv.   Infiltration of Conspiratorial Groups by Undercover Agents or Informants

The August affidavit also discussed the infiltration of the conspiracy group by undercover agents and/or informants. (Exhibit B, at 42-43, 44.)

First, the affidavit explained why undercover purchases of narcotics, although valuable, had failed to uncover the full extent of Carrera's criminal activity and associates, and specifically had failed to uncover the identity of Carrera's source of narcotics or the locations where the narcotics were stored and/or packaged.  The affidavit explained how an undercover agent had tried different techniques to discover Carrera's source, but that Carrera had maintained his secrecy. The affidavit explained that if the undercover agent became too insistent on learning the information, Carrera "would

14

undoubtedly" become suspicious and stop selling to the undercover agent, possibly placing the agent in danger, and certainly jeopardizing the investigation. Further, the affidavit explained that the agent probably would never reach the necessary level of trust with Carrera to discover that information because Carrera probably would only allow someone with whom he had a common background to reach that level of trust. In addition, the affidavit explained that the affiant was unaware of any other viable confidential source who could capably introduce an undercover law enforcement officer to Pacheco or any other member of the conspiracy to make controlled purchases of narcotics.

The affidavit also explained that a confidential informant had not been able to learn the scope and methods of the narcotics distribution operations. The affidavit further explained that the confidential informant was not considered to be at a level of the narcotics operation where it would be likely that such information would be divulged. The affidavit explained that a second informant had gained some valuable information, but the second informant had been arrested, at which time Carrera and Pacheco changed telephone numbers to protect themselves from possible information given to law enforcement. In other words, the use of confidential sources had limited uses in the investigation, and law enforcement was unable to develop new informants who could gain the trust of the members of the drug trafficking conspiracy.

15

The court concludes that this part of the affidavit sufficiently explained how the investigative technique had been unsuccessful, would be unsuccessful, or would be too dangerous to accomplish the goals of the investigation.

### v.   Pen Registers or Trap and Trace Devices

The August affidavit also discussed pen registers and trap and trace devices.  (Exhibit B, at 45-46.)  The affidavit discussed the use of such devices on Carrera's known telephones and on two of Pacheco's telephones.  The affidavit goes on to explain why the use of these devices had proven unsuccessful in accomplishing the goals of the investigation.  The affidavit explained that Carrera and others changed telephones frequently, and it was hard to keep up with the conspirators by getting new pen register orders for each new phone.  Carrera and others frequently subscribed to telephones in different names, making it difficult for law enforcement to identify who was using what telephone at any given time.

Also, pen register information is historical, not in "real time."  In addition, pen register information only lists what telephone communicated with what other telephone.  It does not provide who spoke on the phone, or provide any information about what was discussed.  Therefore, any information obtained from pen registers was of limited use, as it could not be used in coordination with real time surveillance to monitor the activities of co-conspirators as the calls were taking place.

Thus, the court has reviewed the section of the affidavit
addressing pen registers and trap and trace devices, and
concludes that it sufficiently explained how these investigative
techniques had been unsuccessful, would be unsuccessful, or would
be too dangerous without the assistance of a wiretap.

### vi.   Other Normal Investigative Techniques

Finally, the affidavit also addressed the following three
other investigative techniques and explained how they would
likely be unsuccessful in accomplishing the goal of the
investigation:   electronic tracking devices, pole cameras, and
trash searches.

First, the affidavit explained that the use of an electronic
tracking device cannot successfully be used because Carrera is
constantly changing the car he drives.   (Exhibit B, at 41-42.)
The affidavit explained that in almost every narcotics
transaction, Carrera had shown up in a different vehicle, and
none of the vehicles were registered to Carrera or to the same
person.   Further, a common link between the registered owners of
the vehicles had not been determined.

Second, the affidavit explained that the use of pole cameras
was unlikely to result in the gathering of sufficient evidence to
prosecute all members of the conspiracy.   (Exhibit B, at 42.)
The affidavit explained that although pole cameras help determine
the level of foot or vehicle traffic in and out of or around a
particular location, they did not possess the clarity to allow

the identification of people or vehicles, nor do they see what is happening inside a location.  In addition, the affidavit explained that pole cameras should be carefully used because narcotics dealers were familiar with them, and they could compromise an investigation if discovered by alerting those engaged in the drug transactions that they were under police surveillance.  The affidavit also explained that when Carrera dealt drugs in his home, he did so inside his home, where a pole camera would have no access.

Third, the affidavit explained that a trash search of Pacheco's trash was unlikely to be successful because he lived in an apartment complex with a common trash dumpster, and without knowing when Pacheco was taking out his trash, it would be impossible to locate Pacheco's trash among all the other trash in the common dumpster.  (Exhibit B, at 45.)  Also, the affidavit explained that a search of Carrera's trash may result in some additional evidence of his drug trafficking activities, but it was unlikely to result in evidence against Pacheco or other members of the conspiracy.  (Exhibit B, at 45.)

As such, the August affidavit successfully explained why other normal investigative techniques would be unsuccessful in accomplishing the goal of the investigation.

### b.   October 24, 2005 Affidavit

The section of the October affidavit is very similar to the section of the August affidavit that covers other investigative techniques.  Like the August affidavit, the October affidavit discussed surveillance, questioning and interrogation of witnesses or participants, use of search warrants, infiltration of conspiratorial groups by undercover agents or informants, pen registers or trap and trace devices, and other normal investigative techniques, such as electronic tracking devices, pole cameras, and trash searches.  (Exhibit A, at 38-49.) Although this section of the October affidavit is nearly identical to the same section of the August affidavit, the October affidavit provided some new information.  For example, in discussing surveillance, the October affidavit discussed the continuing efforts made by law enforcement to conduct surveillance on Carrera; that Carrera employed counter-surveillance techniques to lose law enforcement on August 24, 2005, and August 27, 2005; and that Carrera talked over the telephone about seeing law enforcement watching and following him.

In the section that discussed the use of questioning and interrogation of witnesses or participants, the October affidavit explained how law enforcement attempted to talk to Defendant Espitia after an August 25, 2005 traffic stop, but that investigative attempt proved unsuccessful.  (Exhibit A, at 43.)

19

Officers also learned that Espitia is Carrera's brother-in-law, confirming agents' suspicions that co-conspirators would be unwilling to discuss details of the narcotics operation because of their relationship and close ties to Carrera.

The October affidavit also explained, in discussing the use of electronic tracking devices, that intercepted communications had revealed that Carrera had access to vehicles supplied by his associates and drug customers, explaining Carrera's ability to frequently change vehicles.  (Exhibit A, at 40.)

The court has carefully reviewed each of the areas of normal investigative techniques, discussed in more detail in the section above examining the August affidavit.  As with the August affidavit, the October affidavit adequately covered each of the required types of investigative techniques and adequately explained in detail why those techniques had been unsuccessful, would likely be unsuccessful, or would be too dangerous to accomplish the goals of the investigation.  As set forth above, the October affidavit also added some new information confirming that these normal investigative techniques were unsuccessful in accomplishing the goals of the investigation.  As a result, the court does not once again separately discuss each of the investigative techniques; instead, the court concludes, for the same reasons set forth above in the section discussing the August affidavit, that the October affidavit adequately explained why

each of the normal investigative techniques would be
unsuccessful, had been unsuccessful, or would be too dangerous.

As such, the affidavit successfully explained why other
normal investigative techniques had been unsuccessful and would
continue to be unsuccessful in accomplishing the goals of the
investigation.

In summary, the court concludes that necessity was shown for
both of the challenged court orders and the resultant wiretaps.
The court now turns its attention to Defendants' argument that
the evidence obtained from the wiretaps should be suppressed
because investigators failed to properly minimize the wire
intercepts.

### B.  Minimization

Wiretapping or electronic surveillance must "be conducted in
such a way as to minimize the interception of communications not
otherwise subject to interception . . . ."  18 U.S.C. § 2518(5).
To determine whether the government properly minimized calls,
this court must focus on the reasonableness of the agents'
efforts to refrain from monitoring conversations deemed non-
pertinent to the investigation.  *See Scott v. United States*, 436
U.S. 128, 139 (1978); *United States v. Willis*, 890 F.2d 1099,
1101 (10th Cir. 1989); *United States v. Apodaca*, 820 F.2d 348,
350 (10th Cir.), *cert. denied*, 484 U.S. 903 (1987).
"Reasonableness must be determined from the facts of each case."
*Willis*, 890 F.2d at 1101.  "Because of the necessarily ad hoc

21

nature of any determination of reasonableness, there can be no inflexible rule of law which will decide every case." *Scott*, 436 U.S. at 139.  "The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations.  Whether agents have in fact conducted the wiretap in such a manner will depend on the facts and circumstances of each case."  *Id.* at 140.

Furthermore, in determining reasonableness, "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer."  *Id.*  "Such percentages may provide assistance, but there are . . . cases . . . where the percentage of nonpertinent calls is relatively high and yet their interception was still reasonable."  *Id.*

In addition, "when the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise.  And it is possible that many more of the conversations will be permissibly interceptible because they will involve one or more of the co-conspirators."  *Id.*

The type of phone being wiretapped may also have some bearing on the type of minimization required.  For example, a tap on a public telephone would require greater minimization, while a tap on the personal phone of the head of a major drug ring would allow for the interceptions of more conversations.  *See id.*

22

Also, officers should be given extra leeway in the early stages of investigation when it is difficult to determine which calls are relevant and which are irrelevant. *See id.* at 141.

Therefore, "minimization does not require perfection in differentiating between innocent and criminal conversations," and various factors should be considered in determining if agents improperly minimized, including the total circumstances of the wiretap, the breadth of the investigation, and the stage of the investigation, with more leeway granted in broad investigations and in the early stages of the wiretap. *See Killingsworth*, 117 F.3d at 1166.

### 1.  **Were the Two Intercept Orders Impermissibly Broad?**

Turning to the instant case, Defendants make two main minimization arguments.  First, Defendants argue that the August 22 and October 24, 2005 intercept orders were impermissibly broad.  Defendants argue that although the orders contained a probable cause statement for matters relating to the possession and distribution of drugs, the orders allowed interception of protected conversations that relate to any conceivable crime.

The court concludes that Defendant's argument lacks merit. The two court intercept orders specifically found that there was probable cause to believe that the targeted telephones were being used in connection with the specified drug offenses.  (Docket Entry #395, Exhibit C (hereafter referred to as "Exhibit C"), at 1-3; Docket Entry #395, Exhibit D (hereafter referred to as

23

"Exhibit D"), at 1-3, 4.)  The court's orders specifically allow the interception of only "the above-described offenses" or "the above-stated offenses."  (Exhibit C, at 4; Exhibit D, at 4.)  Thus, the orders did not authorize interception of conversations that related to any conceivable crime, as Defendant argues; instead, the orders authorized interception only of those conversations relating to the drug offenses specified earlier in the order.

In addition, the court received ten-day reports throughout the interception period, pursuant to another provision of the court's same order.  (Exhibit C, at 7; Exhibit D, at 8.)  These reports allowed the court to monitor what communications were being intercepted pursuant to its orders.

Furthermore, Defendants have not pointed out any communications having to do with crimes other than the drug crimes specified in the court's orders.  As a result, the court rejects Defendants' argument that the two intercept orders were impermissibly broad.

### 2.  Were A Number of Conversations Not Minimized?

Second, Defendants argue that a number of conversations were not minimized.  Specifically, Defendants argue as to telephone number (801) 414-9763, that calls 1284, 1759, 1966, 3031, 3552, and 1294 should have been minimized as irrelevant.  Further, as to telephone number (801) 759-7129, Defendants argue that calls 46, 226, 252, 264, 307, 332, 375, 445, 633, and 728 should have

been minimized as irrelevant.  Defendants argue that these
sixteen calls were not minimized in accordance with 18 U.S.C. §
2518(5), and that a review of the calls, under the facts of this
case, establishes a clear failure to comply with the statute,
warranting suppression.

The government has explained that in giving minimization
instructions to agents and monitors, two minutes was provided as
a reasonable and permissible time period in which to initially
monitor a call to determine if the conversation was pertinent to
the investigation, as authorized by the intercept orders.
Defendants have not challenged the two-minute reasonableness
instruction.  Of the calls challenged by Defendants, the
government has explained that the following calls were under two
minutes in length, and therefore, according to the minimization
instructions, need not have been minimized:  on telephone number
(801) 414-9763, calls 3031 (1:33) and 3552 (1:41); on telephone
number (801) 759-7129, calls 46 (1:36), 261 (1:16), 307 (1:07),
332 (1:13), 445 (1:20), 633 (1:20), and 728 (1:23).  In addition,
the government has explained that, on telephone number (801) 414-
9763, call 1759 contained no audio and was only two seconds in
length.  Therefore, the court rejects Defendants' minimization
argument as to these ten calls because they were under two
minutes in length.

The government has explained that call 226 on 759-7129 was
two minutes five seconds in length.  The call was between Erick

Zendejas and Defendant Carrera and involved a discussion of
Carrera obtaining "stubs."  The government has explained that at
the time of the call, it was difficult to determine what this
conversation was actually about, given Carrera's heavy use of
code words, and the monitor could have reasonably thought that
the conversation about "stubs" was about drug proceeds.  The
court accepts the government's argument about this call and
concludes that it was reasonable for the monitors to listen to
it.  Therefore, the court rejects Defendants' argument regarding
this call.

The government has explained that call 252 on 759-7129 was a
four minute 41 second call between Juan Morfin and Carrera
regarding Morfin meeting Defendant Angel Gaona in Las Vegas to
acquire drugs to be brought back to Salt Lake City.  Therefore,
this call was a pertinent call between Carrera and his supplier
in California regarding the imminent delivery of drugs.  As a
result, the court concludes that this call was properly not
minimized because it was relevant and pertinent to the
investigation.

The government also explained that call 375 on 759-7129 was
a call of someone checking the voicemail on the phone.  The
government explained that although this call was technically four
minutes fifteen seconds in length, each message or single
communication was well under two minutes, and several of the
messages were pertinent in nature.  For example, one message was

from Segura and Defendant Eric Angell calling Carrera to tell him
that he had arrived and needed to speak to Carrera.  Another
message was from a drug customer, "Linda," calling Carrera
regarding meeting her.  Two messages were from Agent Crosby to
Carrera.  Another message was from Segura and Defendant Jeffrey
Thiemig telling Carrera to call them.  The government explained
that if this call had been minimized for even thirty seconds,
some of these pertinent messages may have been missed.
Defendants have not contested any of this information provided by
the government.  The court concludes, based on the government's
explanation, that this call was properly intercepted.  Therefore,
the court rejects Defendants' argument that this call was
improperly minimized.

Of the calls challenged by Defendants, three are left to
address:  calls 1284, 1294, and 1966 on 414-9763.  The government
has explained that call 1284 was seventeen minutes and 59 seconds
and was not minimized.  The call was between Carrera and an
unknown female.  Their conversation involved, among other things,
talk of Carrera sending money to the female, of Carrera sending
cars to the female, and of the difficulty crossing the border
between Mexico and the United States.

The government has explained that call 1294 was two minutes
and 53 seconds in length.  It involved a conversation between
Carrera and a woman, possibly his mother.  That conversation was
about sending money.

Finally, the government has explained that call 1966 involved Carrera and an unidentified female.  The female talked to Carrera about "problems" with "those guys."  The female told Carrera she did not want any problems.  According to the government, the monitor listened to this call for a little longer than two minutes.  The government argues that the monitor listened for a little longer than two minutes because he was trying to get some context to the conversation, to figure out who "those guys" were, or what the problems were, and if they had something to do with the drug trafficking activities.

The government also argues that calls 1284 and 1294 were monitored based on the premise that any conversation regarding money might be drug related because Carrera had no other source of income, and monitoring agents did not know what he did with his money from drug sales or how he got that money back to Mexico.

The government has explained that more than 6,000 calls were received, yet Defendants have challenged only sixteen of those calls.  Keeping in mind the standard for determining whether an intercepted call is properly minimized, the court concludes that the explanations offered by the government for these last three calls is reasonable, and that overall, the government has shown that its minimization efforts with regards to the wiretap calls were objectively reasonable in light of the facts known to the monitoring agents at the time the calls were intercepted and the

scope of the investigation.  Having made a prima facie showing of reasonable minimization, the burden then shifts to Defendants to show more effective minimization could have taken place.  *See Willis*, 890 F.2d at 1102.  Defendants have failed to make such a showing.

Accordingly, the court rejects Defendants' arguments regarding lack of necessity and minimization with regards to the wiretaps.  As a result, the court recommends that Defendants' motions to suppress evidence derived from the wiretaps be denied.

**RECOMMENDATION**

Based on the foregoing analysis, the court concludes that the affidavits supporting the applications for the August 22, 2005, and October 25, 2005 wiretap orders showed necessity, and the investigators were reasonable in their efforts to minimize non-pertinent conversations.  As a result, **IT IS HEREBY RECOMMENDED** that Defendant Javier Segura's motion to suppress evidence derived from the wiretaps (**Docket Entry #324**), which was joined by Defendants Mont Housekeeper, Eric Angell, and Jeffrey Thiemig (Docket Entries #339, 341, 400), and Defendant Genaro Medina Luna's motion to suppress evidence derived from the wiretaps (**Docket Entry #330**) be **DENIED**.

Copies of the foregoing report and recommendation are being mailed to the parties who are hereby notified of their right to object to the same.  The parties are further notified that they

must file any objections to the report and recommendation, with the clerk of the district court, pursuant to 28 U.S.C. § 636(b), within ten (10) days after receiving it.  Failure to file objections to both factual and legal findings may constitute a waiver of those objections on subsequent appellate review.

DATED this __14th__ day of March, 2007.

BY THE COURT:

Samuel Alba
United States Chief Magistrate Judge